## Charles M. Reed *against* John and David Dick.

An opinion expressed by the crew of a vessel, in consultation with the master on the soundness of a link in a chain-cable which they were paying out to prevent her from dragging her anchors, is admissible in proof of its adequacy to the ordinary exigencies of the navigation.

Evidence that other vessels driven into port by the same storm, were staunch and strong as any employed in the trade, is competent to show its violence.

Also, that the sails were insufficient, is inoperative where the loss is assumed to have been occasioned exclusively by the insufficiency of a cable.

The expense of overland transportation, after the goods have been unconditionally received at an intermediate port, must be borne by the merchant, and not by the carrier.

ERROR to the common pleas of *Crawford* county.

The plaintiffs below declared against the defendant, who was sued as a common carrier, with another not taken, for damage to their goods aboard the schooner Farmer, from Buffalo in New York, to Erie in Pennsylvania; and laid their damages at 5000 dollars.　The Farmer sailed with other vessels in the beginning of October 1833, the most tempestuous season of lake navigation, and was driven back by stress of weather. The gale having moderated, she sailed again, but was compelled to go into Dunkirk for a harbour, where she lay at single anchor till the next day but one, when it came on to blow a hurricane, and she began to start from her moorings.　She was brought up by an additional anchor and chain cable, but shortly started again, and the cables were paid out till within twenty fathoms of their extent, when a rope-yarn was observed, which had been bound around a particular link, to mark it as unsound, by a hand who had left the vessel.　The master was called to inspect it, and all hands, as it was alleged, having joined in pronouncing it sound, the cables were paid out as far as they would reach.　In less than an hour the chain cable parted, (whether at the suspected link had not been ascertained,) the other was slipped, sail was made with the jib, and the crew were unable by it to clear a ledge of rocks towards which the vessel had been dragging, as well as to run her ashore at the most desirable place.　Only one

of the other vessels in the harbour rode out the gale. On opening the Farmer's hatches next day, her cargo was found to be wet; the plaintiff's goods were landed, delivered to his agent, unpacked, dried, and forwarded to him overland.

In the course of the trial several points of evidence were ruled and excepted to. The defendant proposed to ask a witness whether the crew did not accord with the master in pronouncing the doubtful link to be a sound one; but the question was overruled. He asked whether the vessels which sailed in company with the Farmer, and put back with her, were not as seaworthy as any on the lake; and the answer was suppressed. Evidence was admitted to prove that the mainsail was eaten in holes by rats, and that the flying-jib was torn by the flukes of the anchor: also, of the plaintiff's expenses incurred in transporting their goods by land, which, the judge charged, might be considered in estimating the damages. To other matters, also, not noticed by the court here, bills of exceptions were taken but not sustained.

The jury found for the plaintiffs 2304 dollars, and the defendant brought a writ of error.

*Dereckson* and *Farrelly*, for plaintff in error, cited 4 *Binney* 134; 3 *Kent* 228; 5 *Binney* 525; 1 *Wash. C. C. R.* 530.

*Riddle*, for defendant in error, cited 5 *Watts* 425; *Abbot on Shipping* 329; 8 *Serg. & Rawle* 537; 1 *T. R.* 33; and 4 *Whart.* 204.

The opinion of the Court was delivered by

Gibson, C. J.—Whether we look to the carrier's common law responsibility or to the limit assigned to it by the exception in the bill of lading, we must hold him bound, at the peril of consequences actually produced by any defect in that particular, to provide a vessel sufficiently furnished with tackle and apparel to encounter the ordinary dangers of the voyage; not its extraordinary and unforeseen dangers against which it behooves the merchant to secure himself by a policy of insurance. It might be supposed, therefore, that seaworthiness could not enter into the question of a carrier's liability for a loss from an act of God; or, to speak more reverently, inevitable accident with which it might seem to have no connection. But the term is used comparatively, and as indicating a result, not exclusively of irresistible force, but of force above what is ordinarily experienced; and deficiency of equipment for ordinary exigencies, may consequently be the effective cause of loss from an extraordinary peril which would not otherwise have been disastrous. Who can set bounds to the success of human exertion by ordinary means, without which the end would be unattainable? By the energy of the crew, many a ship, whose fate would have been sealed by the breaking of a brace or the snapping of a spar, has

[Charles M. Reed v. John and David Dick.].

been rescued from a lee shore. The longer a sinking ship can be kept afloat, the greater her chance of succour—and of the benefit of a chance, the merchant or insurer is not to be deprived—but he would be deprived of it by a defect in the pumps, or by any thing else that would hasten the catastrophe. There may, however, be disasters so sudden and so overwhelming, as to bid defiance to precaution; and in respect to these, want of preventive apparatus for accidents of another kind, would not preclude the carrier from insisting on exemption from a loss occasioned by one of them as an act of Providence: as we ruled in Hart *v.* Allen & Grant, 2 *Watts* 114, where the damage was induced by capsizing in a squall. Now as the proximate cause of the loss, in the case at bar, was the parting of a cable, its actual sufficiency for ordinary purposes without regard to the master's knowledge of its condition, was the point on which the cause turned; and the objection to the opinion of the crew in consultation with him, was not for its supposed incompetence in the abstract, but for the want of an attestation of it by the oaths of those who had expressed it. I remember not what, or whether any, has been given for the admissibility of such evidence in cases of jettison; but it seems to be admissible, on general principles, as part of the *res gesta.* Seamen are expert in nautical affairs, and their judgment, in matters of opinion, touching the working and preservation of a ship, may be as satisfactorily attested by their acts when impelled by motives of duty and self-preservation, as if it were given under the sanction of an oath. It was remarked by Mr Justice Story in Tidmarsh *v.* The Washington Insurance Company, 1 *Mason* 439, that the standard of seaworthiness is arbitrary and dependent on the opinions of nautical men: and certainly their opinions cannot be better manifested by their oaths than they are by their acts, which go to make up the usages of the port. Besides, when the rejected evidence was proposed, no other proof had been given of the supposed flaw in the cable, than that a mark had been put upon a link in it by a hand who had left the vessel; and surely to the judgment of that hand, thus indicated, might be opposed the declared judgment of the crew.

The evidence of the condition and qualities of other vessels which were unable to keep the lake, was competent to show the violence of the storm; but inoperative, as the turning point of the cause was the sufficiency of the Farmer's anchors and cables. Evidence of the condition of her sails, also, was competent in the first instance, but inoperative. As already observed, the carrier was bound to provide a vessel adequate to the navigation; but according to Hart *v.* Allen & Grant, the question of adequacy arises only where inadequacy could have contributed to the event. Now it appears, without contradiction, that when the chain cable parted, the other one was slipped, and that the vessel was beached by means of her sails at the most eligible place in the harbour. It is clear, there-

VIII.—2 Q*

fore, that the sails did their office to the extent of the service required of them.

The only founded exception, else, was taken to evidence of expense incurred by overland transportation of the goods after they were taken into the plaintiffs' possession; and to a consequent direction that it might be a constituent of damages.  Nothing is clearer than that the contract is entire; and that acceptance of the goods at an intermediate port, is an abandonment of it.  Where it is not entirely performed by delivery at the place of destination, the merchant, being liable for no payment but *pro rata* freight, and for that only in special cases, is entitled to nothing for time and labour spent in partial conveyance.  "When goods," says Mr Beneche in his *Principles of Indemnity*, page 448, "in consequence of a ship being disabled by a peril of the navigation from completing her voyage, are transshipped and forwarded to the place of their destination;" that is, as I take it, by the original carrier, "the increase of freight thereby incurred, must be borne, generally speaking, by those for whose benefit the goods were sent to their destination."  For whose benefit were they sent on in this instance? "If," says Molloy, B. 2, ch. 4, sect. 5, "the ship, in the voyage, becomes unable without the master's fault, or that the master or ship be arrested by some prince or state in her voyage, the master may either mend his ship or freight another.  But if the merchant will not agree to the same, then the freight becomes due for so much as the ship hath earned; for otherwise the master is liable for all damage that shall happen: and, therefore, if the ship to which the goods are translated, perish, the master shall answer; but if both ships perish, then he is discharged."  And *Maylines*, page 89, says the same.  But this regards two things: the carrier's increased responsibility for the safety of the goods when transhipped without the merchant's consent; and the merchant's liability for *pro rata* freight when he elects to have them at the port of necessity.  I find no authority to charge the carrier, in such a case, with the duty or expense of subsequent transportation.  On the contrary, it results from the indurability of the contract, that the merchant, having taken his goods into his own keeping, for his own purposes, is the person for whose benefit they are to be forwarded, and who is consequently to bear the expense of it.  As to him, the voyage is ended; and as to the future, the carrier has neither duty nor reward.  The merchant has superseded the contract by an arrangement of his own, and can claim nothing for prospective charges under it.  The acceptance of the goods, in this instance, was unconditional; and the charges that grew out of it, all but those for salvage, are not, in any event, to be borne by the defendant.

Judgment reversed, and a *venire de novo* awarded.